J-S07032-22

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN RE: K.C.W. | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: A.B.S., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1301 WDA 2021 |

Appeal from the Order Entered October 7, 2021
In the Court of Common Pleas of Cambria County Orphans' Court at
No(s): No. 2021 -291VT

BEFORE:   OLSON, J., SULLIVAN, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:                 **FILED: MARCH 23, 2022**

A.B.S. (Mother) appeals from the order entered in the Court of Common Pleas of Cambria County (orphans' court) granting the petition filed by Cambria County Children and Youth Services (CYS) to involuntarily terminate her parental rights to K.C.W. (Child) (d.o.b. February 2020) pursuant to the Adoption Act, 23 Pa.C.S. § 2511 (a)(1), (2), (5), (8) and (b).[1]  She asserts that the evidence was insufficient to terminate her parental rights because she

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] The October 7, 2021 order also involuntarily terminated the parental rights of K.W. (Father) to Child.  He has appealed the order at docket number 1285 WDA 2021 and is not the subject of this appeal.  He will only be mentioned to the extent necessary to provide a full picture of the pertinent events.

was not provided with sufficient assistance for reunification, particularly under the unique circumstances provided by the Covid-19 pandemic. We affirm.

We take the following factual background and procedural history from our independent review of the record and the trial court's October 6, 2021 opinion.

**I.**

**A.**

CYS became involved in this case when Mother tested positive for marijuana at the time of Child's birth in February 2020. Upon being notified of Mother's positive drug test, CYS did an investigation that revealed severe behavioral health, financial and domestic violence issues, as well as the fact that the house where the parents resided was unsafe for Child. Both parents had the aggravating circumstance that their parental rights to all their other children had been involuntarily terminated. CYS took custody of Child in the hospital two days after her birth and Child has not been returned to parents' care. Despite the aggravating circumstances, which could have relieved CYS of its obligations to provide Mother with the opportunity for reunification, the agency elected to move ahead to assist her in this effort. (**See** N.T. Termination of Parental Rights (TPR) Hearing, 6/28/21, at 37).

After the February 24, 2020 adjudicatory hearing, the orphans' court issued an order on March 2, 2020, in which it directed that Mother was to abide by the Family Service/Permanency Plan in which she follow through with

all recommendations from her psychological evaluations; successfully complete parenting skills classes; undergo drug and alcohol assessments, follow through with recommendations and submit random drug screenings; not be aggressive or violent toward anyone; participate in anger management and impulse control therapy/counseling; maintain a safe, clean, adequately furnished home; and cooperate fully with all scheduled home or office visits with CYS caseworkers and service providers, including Independent Family Services, Inc. (IFS) and the Blair Foundation. The order also expressly provided:

> [Mother] and [Father] are not to threaten, harass, or use vulgarity toward [CYS] caseworker[s] or any service providers. These actions will result in the filing of a criminal complaint. [Mother] and [Father] are not to take any actions to instigate others to make threats toward [CYS] staff.

(Order, 3/02/20, at Finding of Fact 15); (Orphans' Ct. Op., 10/06/21, at 5-6); (N.T. TPR Hearing, 6/28/21, 17). The placement plan was reunification, with a projected achievement date of six months, and the concurrent goal was to place Child with a fit and willing relative, if identified.

Mother and Father were supplied with services by IFS. Staff had thirty-minute phone rather than in-person visits with the parents due to the Covid-19 pandemic. Mother was directed to conduct her session in private away from Father. An April 10, 2020 report documented a phone conversation between IFS and Mother after which IFS determined that it would not accept Mother's case due to her "hostility toward the process," which she

- 3 -

demonstrated by using "expletives and derogatory comments toward the IFS supervisor." (Orphans' Ct. Op., 10/06/21, at 6-7) (citing Petitioner's Exhibit No. 14, IFS Report, 4/20/21). IFS staff indicated that "[Mother]'s anger toward not being able to dictate treatment was concerning and it appeared that [she] was more concerned with being "right" about how treatment should be conducted than identifying if her choices would negatively impact her ability to have her daughter returned to her care and custody." (*Id.*).

On July 27, 2020, the court held a permanency review hearing. It found both parents minimally compliant, with both struggling to cooperate with recommended services. Each had made only minimal progress in alleviating the circumstances that necessitated placement. The Permanency Plan provided that the goal continued to be reunification, with a concurrent goal of adoption even though aggravating circumstances existed. Mother and Father were to continue with the steps outlined in the March 2, 2020 order, supervised visits were established and both parents were to continue to refrain from threatening conduct with caseworkers and service providers. (*See* Orphans' Ct. Op., at 7). On February 3, 2021, CYS filed a motion for contempt against the parents for violating the March 2, 2020 order's directive that they not threaten, harass or use vulgarity toward CYS or service providers.

On February 9, 2021, after a January 27, 2021 permanency review hearing, the court ordered the goal changed from reunification to adoption. It again determined that Mother and Father were only minimally compliant with

the Permanency Plan and were not cooperating with CYS or other providers. Child had been in placement for eleven months at that time. In its February 9, 2021 order, the orphans' court specifically found:

- [C]hild has been in placement since February of 2020.

- The parents had failed to comply with the requirements of [C]hild's Permanency Plan.

- Both parents had active criminal cases.

- Mother still used illegal, unprescribed marijuana.

- Each parent had produced positive drug screens.

- Father tested positive multiple times using different illegal substances.

- The parties continued to engage in domestic violence.

- Father has a history of drug abuse.

- Father was not compliant with service providers.

- The parents had been verbally aggressive with the agency caseworkers and service providers.

- The parents were discharged from anger management classes at IFS due to noncompliance and being verbally aggressive.

- The parents had not followed through with the recommendations of their psychological evaluations.

- Mother continues to not address her mental health issues.

- Aggravating circumstances existed as to both parties as a result of prior involuntary termination proceedings.

- [C]hild needs a permanent, consistent environment.

- CYS has exhausted all available resources.

- • [C]hild's best interest requires a goal change to adoption, and the agency has met its burden of proof by clear and convincing evidence.

(Orphans' Ct. Op., at 9-10); (**see also** N.T. TPR Hearing, 6/28/21, at 22-23).

On February 26, 2020, licensed psychologist Dennis M. Kashurba evaluated Mother and Father to ascertain the appropriate services for them to demonstrate parenting potential for Child.

**B.**

On March 4, 2021, CYS filed a petition to involuntarily terminate the parental rights of Child's parents pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8) and (b) because of severe behavioral, mental health, financial, substance abuse, shelter and domestic violence issues.[2] (**See** N.T. TPR Hearing, 6/28/21, at 12). At that time, Child had been out of parents' care for over twelve months. The court held hearings on June 28, 2021, September 13, 2021, and September 15, 2021. CYS produced the testimony of Barb Lusczek, CYS caseworker; Dennis Kashurba, licensed psychologist; Jennifer Drager, Executive Director for In-Home Family Services with IFS; Tami Yeckley, CFS caseworker; May Popovich, CYS casework supervisor; Julia

---

[2] The orphans' court appointed counsel for each parent and Child. Because of Child's age, the court determined there was no conflict between Child's legal and best interests.

Bloom, family advocate with the Blair Foundation Path House; and Kathy Scaife of IFS. Mother testified on her own behalf.

**1.**

Ms. Lusczek was the CYS caseworker in this matter from mid-February 2021 forward.[3] She testified that the juvenile court found aggravating circumstances because both parents had their parental rights to a combined total of seven other children terminated in Blair (Mother) and Dauphin (Father) Counties. Mother had an active criminal case and used illegal, unprescribed marijuana, producing one positive drug screen and refusing another during the life of this case. Mother cooperated somewhat by completing the psychological evaluation, attending parenting classes and establishing anger management sessions with IFS. However, she was discharged from the anger management program due to noncompliance and verbal aggression with service providers and was not addressing her mental health issues. She was more focused on blaming others for the removal of Child than on doing what the court had required of her, and did not follow the recommendations from the initial psychological evaluation, was not consistently cooperative with CYS and "there has been no follow[-]through, no change in lifestyle, no application

---

[3] Ms. Lusczek was the third CYS caseworker in this matter. Ms. Cathy Gorba was the intake caseworker. Ms. Chloe Barrett was the caseworker when Child came into placement until February 2021 when Father made threats against her and her child that formed the basis for his guilty plea to terroristic threats. (*See* N.T. TPR Hearing, 6/28/21, at 47).

of what was learned through the visits." CYS has exhausted all available resources in an effort to assist Mother. Ms. Lusczek explained that Mother was unable to appropriately parent Child, with her most significant barrier being her mental health issues. (*See* N.T. Hearing, 6/28/21, at 16-20, 22-23, 34-35, 43).

CYS initially scheduled weekly one-hour in-person visits with Child, but from March 2020 until May 2020, the visits were changed to half hour virtual visits twice a week due to Covid-19 . Thereafter, they returned to in-person visits. At the visits, Mother was not attentive to Child's needs and had not performed any parental duties within the last year. She would watch or try to talk to Child but would not interact with her. At the one visit Ms. Lusczek observed, Mother was more focused on repeatedly calling Father on the phone than engaging with Child. She did not believe that the parents would put Child's needs and welfare first. (*See id.* at 23-24, 25-26, 29-31).

Neither parent had done anything to demonstrate that they were able to meet the emotional, physical, daily needs of Child or to take responsibility for her initial removal. Instead, their focus remained on blaming CYS, their caseworker, service providers and the foster family. Child had initially been placed with a different foster family, but she was removed at the family's request due to Mother posting abuse allegations and negative comments about them on social media. She was briefly placed with another family

pending approval of the current foster home she lives in with her sibling. (*See id.* at 25, 31).

Ms. Lusczek stated that Child was developmentally on target, bonded with her current foster family[4] and doing well with them. She was sixteen-months-old at the time of the June 28, 2021 TPR hearing and had been with the family for approximately one year at that time. The family ensured that all of Child's needs were met. (*See id.* at 24-25).

CYS believed that it would be in Child's best interest to be adopted by the foster parents due to Mother's failure to do what she needed to do to make life better for Child. Ms. Lusczek testified that there was no bond between Child and Mother and severing her parental rights would not negatively impact Child. It would promote her developmental, physical and emotional needs because she was doing so well in her foster home and bonded with the foster parents. She stated that a bond could have been developed with the infant Child despite Covid-19 restrictions if Mother had put in the effort because she has seen it happen in other families. (*See id.* at 34-36).

**2.**

Ms. Popovich worked with Mother in her supervisory role at CYS beginning in early March 2020. CYS investigated Child's home after receiving

---

[4] The foster family is an adoptive resource. (*See* N.T. TPR Hearing, 9/13/21, at 63).

the referral upon her birth and discovered that there was no hot water or refrigerator, there were bedbugs and the home was in deplorable condition. There were extreme anger issues and both Mother and Father committed domestic violence. She described Child's parents as being extremely argumentative and uncooperative, explaining that she had worked with many families in her nearly ten-year career with CYS and had "never been called so many F-words and swear words and stuff as [she] was with this family." (N.T. TPR Hearing, 9/13/21, at 43). "They continuously harassed the caseworker[, her,] their attorneys and a judge on Facebook. They were very aggressive." (*Id.*). Although they initially signed releases for medical and therapeutic records, they revoked them when the goal was changed to adoption. They refused to meet with the CYS caseworker or to allow her to enter the home to assess if they had made any recommended changes. (*See* at 42-44, 47-48).

To explain the argumentative, contentious and threatening situation created by the parents, Ms. Popovich also testified about CYS filing the contempt action against the parents for violating the Court's March 2, 2020 order directing them to refrain from threatening, harassing or using vulgarity toward CYS caseworkers or service providers. She explained that their numerous social media posts demonstrated that they did not appear at all concerned about Child, but instead claimed they were victims themselves, calling CYS kidnappers and accusing them of sex trafficking and of allowing children to be sexually abused by putting them into the Mennonite sect. They

harassed CYS caseworkers on social media that were not even involved in this case, posted photographs, phone numbers and court documents in an attempt to gain sympathy for themselves and made accusations about anyone in the court system involved in their case, including a judge and their own attorneys. Both parents were held in contempt. (**See id.** at 48-53).

Mother and Father were very belligerent with the original foster parents with whom Child was briefly placed, "accusing them of abuse and all kinds of other things" on social media, which is where CYS found out about most of Mother's concerns since she did not report them to CYS and would not talk to the caseworker. Ms. Popovich explained that approximately one day before the July 27, 2020 permanency review hearing, she saw a posted picture of Child on social media with what appeared to be a brush burn most likely caused by the then-five-month-old Child being on her stomach for tummy time. CYS took Child to the doctor and he advised that this was a brush burn and not abuse. The orphans' court also reviewed the photograph at the July 27, 2020 hearing and agreed with the doctor's finding. (**See id.** at 53-55, 69).

Ms. Popovich also explained that, although Mother and Father were referred to IFS for anger management, they were extremely uncooperative and unsuccessfully discharged. They were also referred to IFS for drug and alcohol counseling, which Mother quit on July 29, 2021, without finishing the program. (**See id.** at 55).

When asked if Mother and Father were receiving a lesser standard of care in the reunification attempt due to their treatment of CYS, Ms. Popovich responded that they actually got more than most cases did. For example, most cases have one visit per week with the child, while they were given two. They were provided with every service available to CYS and they chose not to work with them. When they seemed unable to work with CYS service providers, CYS suggested they find other providers to follow through on the reunification requirements. Thus, CYS was providing them with everything they needed to achieve reunification. (*See id.* at 65).

### 3.

Blair Foundation Path House family advocate Ms. Bloom testified that her role was supervising the visits with Child and doing active parenting with the family. Ms. Bloom estimated only approximately eighteen out of the fifty-four visits at Blair Foundation were virtual. She had witnessed other infants going through a similar visitation situation during the Covid-19 pandemic and the parents in those situations had been able to follow the required steps for reunification and created a bond with their infants. However, although Ms. Bloom completed the active parenting book with Mother, a bond was not established between Mother and Child because she did not take the advice about how to establish one. Mother was unable to soothe her and lacked a motherly instinct; she could not connect with Child. Child appeared uncomfortable with her biological parents. Mother did not apply the active

parenting curriculum to the visits at all and instead of maximizing the visitation time to establish a bond, Mother chose not to interact with Child because she was more concerned with contacting Father on her phone or fighting with him if he was present. Although Child had started talking and was very talkative at her foster home, she would not talk to her parents at the visits. Ms. Bloom testified that Mother was unable to parent Child by herself, but even if Father were present, she would not trust Child in their care because of their consistent fighting. (*See* N.T. TPR Hearing, 9/13/21, at 12-16, 19-20, 22-25, 28, 32, 35-36).

Ms. Bloom observed Child with the foster parents when they would drop her off and pick her up from visits with her biological parents. She described Child as "light[ing] up" when with them. Ms. Bloom observed a bond between Child and her foster parents, was happy when with them and very upset when taken from them for a visit. She agreed that changing Child's goal to adoption was in her best interest because her needs were met and she was in a safe environment with the foster parents. (*See id.* at 24-25).

**4.**

Ms. Scaife of the IFS Home Management Program worked with Child's family on the living conditions at the home from February 2020 until January 2021. (*See* N.T. TPS Hearing, 9/13/21, at 74). On her first visit, she observed that leaking pipes had soaked the kitchen floor, the refrigerator was not working and there was no hot water tank. Father had a hot water tank

installed and some leaks had been repaired. IFS was able to obtain a refrigerator, some furniture and household items for them. Despite these improvements, she recommended that Child not be returned to Mother and Father's custody because of their anger/relationship issues. Because of those continued problems, she supported the goal change to adoption. (***See id.*** at 74-78).

**5.**

Psychologist Dennis Kashurba authenticated the psychological evaluations he authored for each parent before they both were admitted into evidence. (***See*** N.T. TPR Hearing, 6/28/21, at 81-83). He declined to discuss the information in the reports so as not to be perceived as being retaliatory since the evaluations were the subject of a state-level investigation due to parents' complaints. The investigation was closed without any prosecution. (***See id.*** at 82-83).

**6.**

Most of Mother's testimony consisted of conflicting denials about the testimony of Ms. Bloom, Ms. Popovich and Ms. Lusczek and excuses about her history and attempts at reunification with Child. Mother denied CYS's claim that the utilities had been turned off at her premises and that IFS had paid for home improvements, denied any anger issues and stated that Ms. Bloom lied in her testimony. Despite a physician and the court finding that foster parents had not abused Child, who only had a brush burn, Mother claimed that Child

was struck by a firework. She offered confusing testimony about CYS not scheduling appointments for Child around a bus schedule, but agreed that CYS had the authority to make Child's doctor's appointments. Mother testified that she does not like the Blair Foundation Path Program because she is an atheist and it is a Christian-based program forcing religion down her throat, but then admitted that the program did not force Christianity and that she wanted Child placed with a Christian United Methodist family she knew. She blamed her mother for the previous termination of her parental rights to her other child, and stated that Cambria County CYS is targeting her now because it was involved in that case, but she admitted it was her father that had moved for that termination and that it was in Blair County, not Cambria County. (***See*** N.T. TPR Hearing, 9/15/21, at 8, 13-15, 17-18, 21-22, 24-26, 29-30, 33, 36, 39, 42-46).

Although Mother was diagnosed with Post-Traumatic Stress Disorder, Generalized Anxiety Disorder and unspecified Bipolar Disorder, she denied having Bipolar Disorder and stated she has her anxiety under control with the use of marijuana. She denied smoking marijuana while pregnant, however, and testified that the positive drug test at the time of Child's birth was a false positive. She later admitted she smoked marijuana immediately before Child's birth but blamed a treating physician for a kidney infection who did not give her pain medication. (***Id.*** at 12, 20, 34-35, 37, 41-42).

On October 6, 2021, the orphans' court entered an order finding clear and convincing evidence to support involuntarily terminating the parental rights of Mother pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5) and (8). The fourteen-page order contained detailed findings of fact, which included two quotations in psychologist Mr. Kashurba's report. (*See* Order, 10/06/21, at 3-4, ¶ 7A, B). Mother timely appealed and filed a contemporaneous statement of errors. *See* Pa.R.A.P. 1925(a)(2)(i). On November 10, 2021, the court issued an order vacating its October 6, 2021 findings of fact as to Mr. Kashurba's report because, upon review, it found that it was not admitted into evidence.[5] The court relied on the remainder of the reasons stated in its October 6, 2021 order to support its decision.[6] (*See* Order, 11/10/21, at 1); *see* Pa.R.A.P. 1925(a).

---

[5] This appears to be inaccurate since the record reflects both Mother's and Father's reports were admitted into evidence without objection. (*See* N.T. TPR Hearing, 6/28/21, at 82-83).

[6] Mother complains that the orphans' court erroneously relied on Mr. Kashurba's psychological evaluation report to reach its decision, despite the report not being admitted into evidence and Mr. Kashurba not offering substantive testimony about its details. (*See* Mother's Brief, at 8-9). First, as stated above, it appears Mother's report was admitted into evidence. Moreover, even if it had not been admitted, on November 10, 2021, the court vacated its previous findings about the report and relied on its remaining findings of fact. (*See id.*). As we detail more fully above, the evidence of record supports the court's decision without Mr. Kashurba's evaluation. Hence, even assuming the court had originally relied on the report in error, it would have been harmless.

## II.

## A.

Mother argues that the orphans' court erred in finding that CYS produced clear and convincing evidence to support the termination of her parental rights.[7]  (**See** Mother's Brief, at 12-14).  The orphans' court terminated Mother's parental rights pursuant to Section 2511(a)(1),(2), (5), (8) and (b) of the Adoption Act, which provide:

**(a) General rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the

---

[7] We review the orphans' court's order for an abuse of discretion.  **See In re G.M.S.**, 193 A.3d 395, 399 (Pa. Super. 2018) (citation omitted).  Moreover, "[w]e give great deference to trial courts that often have first-hand observations of the parties spanning multiple hearings." **In re Interest of D.F.**, 165 A.3d 960, 966 (Pa. Super. 2017).  "We must employ a broad, comprehensive review of the record in order to determine whether the trial court's decision is supported by competent evidence." **In re S.H.**, 879 A.2d 802, 805 (Pa. Super. 2005).  "The trial court is free to believe all, part, or none of the evidence presented and is likewise free to make all credibility determinations and resolve conflicts in the evidence." **In re A.S.**, 11 A.3d 473, 477 (Pa. Super. 2010).  "If competent evidence supports the trial court's findings, we will affirm even if the record could also support the opposite result." **Id.**

incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

\* \* \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time and termination of the parental rights would best serve the needs and welfare of the child.

\* \* \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and termination of parental rights would best serve the needs and welfare of the child.

**(b) Other considerations.**—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(1), (2), (5), (8) and (b).

It is well-settled that "[w]e need only agree with [the trial court's] decision as to any one subsection of Section 2511(a) and subsection (b) in order to affirm the termination of parental rights." *Int. of K.M.W.*, 238 A.3d

465, 473 (Pa. Super. 2000) (citation omitted). For the following reasons, we conclude that the orphans' court correctly determined that CYS met its burden of proof under subsections 2511(a)(2) and (b).

**B.**

We first address the court's termination of Mother's parental rights pursuant to Section 2511(a)(2). **See Int. of K.M.W.**, **supra** at 473.

In a termination proceeding, the moving party must produce clear and convincing evidence with respect to the following elements to terminate parental rights pursuant to Section 2511(a)(2): (1) repeated and continued incapacity, abuse, neglect or refusal; (2) such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. **See In re Adoption of M.E.P.**, 825 A.2d 1266, 1272 (Pa. Super. 2003).

Pursuant to Section 2511(a)(2), parents are "required to make diligent efforts towards the reasonably prompt assumption of full parental responsibilities." **In re J.R.E.**, 218 A.3d 920, 925 (Pa. Super. 2019) (citation omitted). "A parent's vow to cooperate, after a long period of uncooperativeness regarding the necessity or availability of services, may properly be rejected as untimely or disingenuous." **See id.** (citation omitted). "The grounds for termination of parental rights under Section 2511(a)(2) due

to parental incapacity that cannot be remedied are not limited to affirmative misconduct; to the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." **In re S.C.**, 247 A.3d 1097, 1104 (Pa. Super. 2021) (citation omitted).

Instantly, the orphans' court explains that:

> The relationship between [Child's parents] and CYS can be described in a few words as noncooperative and hostile. Each parent talked a good game on direct and cross-examination. Each parent asked for more time to improve, blaming everyone else for their shortfalls. As stated by the Pennsylvania Superior Court in **In Re: Adoption of R.J.S.**, 901 A.2d 502[,] 513 (Pa. Super. 2006) …

> > The Court cannot and will not subordinate indefinitely a child's need for permanency and stability to a parent's claims of progress and hope for the future. Indeed, we work under statutory and case law that contemplates only a short period of time … in which to complete the process of either reunification or adoption for a child who has been placed in foster care.

> … Petitioner, [CYS] has established a legal basis for terminating the parental rights of [Mother.]

(Orphans' Ct. Op., at 10).

It is undisputed that Child, approximately sixteen-months-old at the time of the first TPR hearing, had been in foster placement since birth and with her current foster family for one year. CYS presented clear and convincing evidence that the conditions that led to Child's placement continued to exist.

Mother argues that although she initially complied, she became increasingly frustrated with the system during the reunification process, which

- 20 -

she admits resulted in some poor decisions. (*See* Mother's Brief, at 12). Although Mother attempts to frame her issue as being about Covid-19, in substance, her claims are unrelated to the Covid-19 pandemic. She argues that the efforts at reunification "fell short" where CYS consistently ignored her wants and needs, "forcing religion down her throat" by using the Blair Foundation Path Program even though she is an atheist, "inflated issues that did not exist relative to ability" and failed to take her concerns about Child's safety seriously. (*Id.* at 13, 14) (citing N.T. TPR Hearing, 9/15/21, at 15, 24-26, 29). The evidence of record belies Mother's argument.

Ms. Lusczek testified that Mother's goals, including attending anger management classes and addressing mental health issues, remained the same throughout the life of this case, but that she was more focused on posting against the foster parents, CYS and caseworkers on social media and looking for fault and blaming others than she was on making efforts to reunify with Child. (*See* N.T. TPR Hearing, 6/28/21, at 19-20, 25, 29-30). Mother has taken no responsibility for Child's removal, instead blaming CYS, its caseworkers (those both involved and not involved in the case), service providers and the foster parents. (*See id.* at 31). Instead of addressing her mental health issues through medication or therapy, she either self-medicated or alleged she was misdiagnosed. (*See id.* at 20). She was discharged from the anger management program at IFS due to her own volatile actions during the attempted treatment and there were continued domestic violence reports

between the parents. (*See id.* at 18, 22). After her initial positive drug screen for marijuana, Mother refused the screen after that. (*See id.* at 18).

The biggest concerns for reunification were Mother's inability to provide appropriate parenting and nurturing for Child and her failure to get her mental health under control, either through medication or counseling, which rendered her incapable of managing other aspects in her life. (*See id.* at 20, 29). Mother observed or spoke to Child but was unaware of how much babbling and talking she did because Mother did not engage with her since she was more focused on repeatedly calling Father on the phone than interacting with Child. (*See id.* at 23-24). Mother was not attentive to Child's needs at the visits, instead putting herself first. (*See id.* at 25-26). Ms. Lusczek testified that Mother has not done anything to indicate that she would remedy the mental health, parenting or domestic violence issues in a reasonable amount of time or demonstrated any ability to meet Child's emotional, physical or daily needs. (*See id.* at 30-31).

Ms. Popovich testified that Mother was given more reunification attempts than most because she was allowed two visits per week instead of one. She was provided with every service available to CYS, unsuccessfully discharged from IFS anger management and elected not to avail herself of other services. The agency recommended that she seek out other providers so that she could comply with the requirements for reunification, but she failed to provide proof that she had successfully done so. (*See* N.T. Hearing,

9/13/21, at 65). In fact, although Mother signed releases at the time of intake, she either revoked or refused to sign them or talk to her caseworker thereafter, in violation of the Permanency Plan, denying CYS the opportunity to confirm her progress, if any. (**See id.** at 47-48).

As to any alleged safety issues, the record reflects that Mother failed to report anything of that nature to CYS since she would not speak to the caseworker. Instead, Ms. Popovich saw a posted photograph of Child with an alleged injury on social media. (**See** N.T. 9/13/21, at 54-55, 69). CYS immediately took Child to a physician, who determined that the alleged "injury" was a brush burn, a finding that the court concurred with at the July 27 2021 permanency review hearing, despite Mother's claim that it was due to being hit by a firecracker. (**See id.** at 54); (**see** N.T. TPR Hearing, 9/15/21, at 24-25).

Based on the foregoing, despite any limitations imposed by Covid-19, CYS provided clear and convincing evidence that Mother is unable to provide Child with the essential care necessary for her physical and mental well-being where Mother's continued incapacity is caused by her failure to address her mental health, parenting or domestic violence issues or follow through on the necessary steps to achieve reunification. The orphans' court did not abuse its discretion in finding that CYS presented sufficiently clear and convincing evidence to support termination based on Section 2511(a)(2).

**C.**

Having determined that the court properly found that termination of Mother's parental rights was appropriate under subsection 2511(a)(2), we now consider whether termination is in Child's best interest pursuant to subsection 2511(b).[8]

> With respect to Section 2511(b), our analysis focuses on the effect that terminating the parental bond will have on the child. In particular, we review whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. It is well settled that intangibles such as love, comfort, security, and stability are involved in the inquiry into needs and welfare of the child.

> One major aspect of the "needs and welfare" analysis concerns the nature and status of the emotional bond that the child has with the parent, with close attention paid to the effect on the child of permanently severing any such bond. The fact that a child has a bond with a parent does not preclude the termination of parental rights. Rather, the trial court must examine the depth of the bond to determine whether the bond is so meaningful to the child that its termination would destroy an existing, necessary, and beneficial relationship. Notably, where there is no evidence of a bond between the parent and child, it is reasonable to infer that no bond exists.

> It is sufficient for the trial court to rely on the opinions of social workers and caseworkers when evaluating the impact that termination of parental rights will have on a child. The trial court may consider intangibles, such as the love, comfort, security, and stability the child might have with the foster parent.

---

[8] Mother does not specifically address Section 2511(b). (***See*** Mother's Brief, at 9-14). However, we include our analysis of this section to provide a full review of the orphans' court's decision.

*Int. of K.M.W., supra* at 475 (case citations and most quotation marks omitted).

Ms. Bloom testified that Mother and Child did not have a bond. (*See* N.T. TPR Hearing, 9/13/21, at 19-20, 35-36). She stated that both biological parents failed to take her advice about what they could do to establish a bond with Child. (*See id.* at 28). Mother was unable to soothe Child, did not interact with her to form a bond, and Child appeared uncomfortable around her. (*See id.* at 19-20, 35-36). Child was bonded with her foster family and Ms. Bloom agreed that changing her goal to adoption was in her best interest. (*See id.* at 25).

Ms. Lusczek also testified that Child was developmentally on target and had a bond with her foster family, which provided her with love, comfort, security and stability. (N.T. TPR Hearing, 6/28/21, at 24-25). She opined that it would be in Child's best interest to stay with the foster parents and that severing any bond with her biological parents would not negatively impact her in any way. (*See id.* at 33-36). Ms. Popovich stated that the foster family was an adoptive resource and that Child's sibling also lived there. (*See* N.T. TPR Hearing, 9/13/21, at 63). Hence, the record supports the orphans' court's finding that the credible CYS witnesses established that the termination of Mother's parental rights would best serve Child's interests pursuant to Section 2511(b) and we find no abuse of discretion in its decision to terminate Mother's parental rights to Child and in changing its goal to adoption.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/23/2022